IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| JEROME ANDERSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 12 C 1902 |
| | ) | |
| JASON LANDRUM, BRIAN J. | ) | Judge Virginia M. Kendall |
| MCENERNEY, MILTON KINNISON, and | ) | |
| THE CITY OF CHICAGO, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Jerome Anderson sued Defendants Jason Landrum, Brian J. McEnerney, Milton Kinnison (collectively the "Defendant Officers"), and the City of Chicago alleging unlawful seizure, malicious prosecution, illegal search, intentional infliction of emotion distress, battery and excessive force stemming from his March 2011 arrest at his home during which he suffered a broken leg and officers shot and maimed his dog. A jury trial took place in May 2014. After five days of hearing testimony and argument, the jury returned a verdict in favor of Anderson on his unlawful seizure and malicious prosecution claims. (Dkt. No. 68.) On the remaining counts of the complaint, excessive force, illegal search, intentional infliction of emotional distress, and battery, the jury found for the Defendants. (*Id.*) The jury awarded Anderson $230,000 on the unlawful seizure claim and $150,000 on the malicious prosecution claim. (*Id.*) The Court entered judgment on all claims on May 2, 2014. (Dkt. No. 64.)

The Defendants now move the Court for judgment as a matter of law on the malicious prosecution claim pursuant to Federal Rule of Civil Procedure 50(b) (Dkt. No. 80) or, in the alternative, a new trial as to the unlawful seizure and malicious prosecution claims (Dkt. No. 76),

and a remittitur of the jury's damages award under Federal Rule of Civil Procedure 59(e) (Dkt. No. 78). For the following reasons, the Court denies the Defendants' Motion for Judgment as a Matter of Law on the malicious prosecution claim, denies their Motion for a New Trial, and denies their Motion for Remittitur.

## BACKGROUND

On March 24, 2011, the Defendant Officers responded to a 911 call placed by Tina Grangenois, then Anderson's girlfriend, stating that Plaintiff Anderson would not let her leave his home and that there were guns in the house. (Trial Tr. at 401: 9-11.)   The resulting arrest of Anderson, his injury that occurred during the arrest, the injury to his dog during the arrest, and his subsequent prosecution for the weapons that were recovered from the house, led to this civil rights case.   Defendants seek post-trial review only of Anderson's malicious prosecution and unlawful seizure claims, and as such, the Court summarizes the pertinent testimony and evidence elicited at trial relating to those claims. *See Barber v. City of Chicago*, 725 F.3d 702, 705 (7th Cir. 2013) (courts "routinely set out the conflicting evidence" when considering motions challenging a verdict).

### A.    Malicious Prosecution

During the arrest, the Defendant Officers seized two old shot guns from a closet in Anderson's house on the second floor and charged him with unlawful possession of a firearm without a Firearm Owner Identification ("FOID") card and with domestic violence based on the phone call received from his girlfriend. (Trial Tr. 99:4-9; 227:3-7.) State prosecutors dismissed the domestic violence charge because Grangenois failed to appear to testify (she also refused to sign a complaint at the scene) and a judge later found Anderson not guilty of the possession of a

firearm without a FOID card charge. (Trial Tr. 99:4-9, 16-24; 103:3-6.) Anderson's malicious prosecution claim pertains solely to the weapons charge

At trial, Anderson's attorney argued that had the Defendant Officers conducted any investigation into the ownership of the guns recovered from his home, they would not have charged him with unlawful possession. (Trial Tr. 609.) Anderson testified that the officers on scene never said anything to him about guns in the house at any point before taking him to the police station. (Trial Tr. 87:11-14.) Moreover, Anderson stated that he had no idea Grangenois was going to call the police and did not know why they came to his house. (Trial Tr. 137:17-19.) Regarding the guns, Anderson testified at trial that there were 30-year-old shotguns in the house that belonged to his stepfather, Louis Jackson. (Trial Tr. 87:15-23.) Jackson owned the home with Emma Hamilton, Anderson's sister. (Trial Tr. 179:18-20.) Anderson lived with them. (Trial Tr. 87:18-25.) Anderson testified that the shotguns were locked away in a storage room on the second floor of the home, that the guns were Jackson's, and that Jackson had a FOID card on the day of the arrest. (Trial Tr. 89:23-25.) He further stated that his girlfriend knew they were there because he would go in and out of the storage room and place things inside in her presence on previous occasions. (Trial Tr. 88:1-6; 89:3-11.) When she testified, Grangenois stated that she never saw the storage room unlocked. (Trial Tr. 403:9-10.) Anderson also testified that his bedroom was on the second floor and that the storage room containing the guns was next to his bedroom. (Trial Tr. 88:5-6; 139:10-14.) He further stated that he had a key to the closet where the guns were kept --although this information was not provided to the police on the day of the arrest or presumably at any time prior to the criminal charge being placed. (Trial Tr. 138:9-11.) Anderson told the jury that he did not discuss the guns with Grangenois at any point on the day of the arrest (a point she corroborated), never had the guns out on that day, and did not use the

guns that day. He also testified that he never gave an officer the key to the locked storage room where the shotguns were stored. (Trial Tr. 89:12-22; 92:8-10.)

Officers Landrum and McEnerney testified at the criminal trial against Anderson regarding possession of the shotguns and according to Anderson, Landrum lied. (Trial Tr. 102:2-3; 268:3-4; 386:6-7.) Anderson testified that Landrum lied when he said he was the first to enter and also that he found the shotguns in an open area in plain view. Anderson stated that the shotguns were actually locked away in a closet. (Trial Tr. 102:4-15.)

The jury also heard from Emma Anderson Hamilton, Anderson's sister. Hamilton is also an owner of the home. (Trial Tr. 197:10-11.) Hamilton corroborated Anderson's testimony by testifying that he and Jackson lived in the home together. (Trial Tr. 179:21-25.) Hamilton further testified that the guns in the house belonged to Jackson. (Trial Tr. 193:8-12.) Jackson had owned the guns since the 1950s. Hamilton additionally stated that the guns were kept locked in a closet. (Trial Tr. 193:15-21.)

Grangenois testified that the second floor of the house consisted not only of Anderson's bedroom, but also a small room with a kitchen table and refrigerator. (Trial Tr. 397:11-24.) She testified that she never told Anderson she was going to call the police and did so only because she wanted to leave and knew if she said there were guns in the house that the police would come. (Trial Tr. 400:18-401:5.) She called 911 and said that Anderson would not let her leave, that she had been drinking, and that Anderson had guns in the house. (Trial Tr. 401:9-11; 439:22-24.) Grangenois stated that she told 911 there were guns in the house because she had grown up in a police family and her relatives advised her that police will respond if you mention guns when you call them. (Trial Tr. 401:13-17.) Grangenois testified that she knew there were guns in the house that belonged to Jackson and that they were always locked away in a closet for

safety. (Trial Tr. 401:18-22.) Grangenois said she had never seen the door to the guns unlocked before. (Trial Tr. 403:8-10.) She testified that the closet was on the second floor and that the second floor was Anderson's. (Trial Tr. 440:4-8.) Grangenois testified that she and Anderson never discussed the guns on the day of the arrest and that Anderson never threatened her with the guns. (Trial Tr. 404:4-11.) Upon the police officers' arrival, Grangenois told them that the guns were on the second floor locked in a closet. (Trial Tr. 408:22-25.) She also testified that she never told anyone that Anderson pointed a gun at her. (Trial Tr. 440:17-19.)

The Defendant Officers offered a completely different version of the events that transpired on March 24, 2011. McEnerney testified that he and Kinnison operated as the "paper car" on March 24, 2011, meaning that they were tasked with filling out all police reports for the day. (Trial Tr. 208:15-20.) McEnerney stated that he and the other officers went to Anderson's house in response to a person-with-a-gun call, although the 911 event query stated only "Female crying, her boyfriend won't let her leave the house, he hit her. He does have guns in the house." (Trial Tr. 209:23-25; 581:10-16.) He never saw Anderson with any guns before he entered the house. (Trial Tr. 223:17-19.) He found no evidence that Anderson owned either the guns in the house or the house itself. (Trial Tr. 224:21-225:5.) The officers recovered no ammunition from the house. (Trial Tr. 226:1-4.) McEnerney testified that he thought Anderson possessed the guns because they were in the house, he had the key to the closet where they were found, (although this information was not corroborated at the time of the arrest nor presumably any time prior to the charge) and he threatened to shoot his girlfriend with them, although his girlfriend denied on the witness stand that she ever said that. (Trial Tr. 225:6-8; 245:22-25; 269:11-16.) McEnerney admitted that he thought Anderson owned the guns because he learned more information since the incident, including the fact that Anderson had a key to the closet where the guns were found.

(Trial Tr. 271:1-8.) Kinnison testified similarly, although he admitted that he did not hear Grangenois tell McEnerney that Anderson threatened to shoot her. (Trial Tr. 278:10-17). McEnerney testified that Officers Rumbaugh and Landrum ultimately recovered the guns from the house. (Trial Tr. 264:12-15.)

Once at the precinct, McEnerney interviewed Anderson and asked him if he had a FOID card. Anderson said he did not. (Trial Tr. 265:13-16.) McEnerney stated that Anderson did not respond to any further questions about the guns and that his investigation into the guns showed that they were unregistered. (Trial Tr. 265:17-23.) McEnerney wrote the case report, signed the criminal complaint against Anderson for the unlawful possession of a weapon charge and testified at the criminal trial. (Trial Tr. 227:3-20.) McEnerney testified that he knew that the case report would go to the state's attorney prosecuting the case. (Trial Tr. 228:14-18.) Kinnison testified that although he did not recover the guns from Anderson's home, he helped prepare the arrest reports with McEnerney. (Trial Tr. 319:13-25.) Kinnison reviewed and signed off on the reports but did not testify at Anderson's criminal trial. (Trial Tr. 320:4-9.)

Rumbaugh testified that when he arrived at the house, a woman (Grangenois) came running out of the back of the house and that he and other officers gained entry to the house from the door she exited. (Trial Tr. 533) Rumbaugh stated that after the dog was shot, Grangenois told him that Anderson had prohibited her from leaving and that he would shoot her if she left. (Trial Tr 535.) (Grangenois denied on the witness stand that she said this to any officer on the scene. (Trial Tr. 440:9-19.)) Landrum, the officer who shot the dog, and Rumbaugh's testimony regarding the guns largely mirrored that of the other Defendant Officers. Landrum testified that he responded to a man-with-a-gun call, which, as noted above, is not precisely what the 911 call states. (Trial Tr. 364:18-21.) Instead, the 911 query said that Anderson had guns in the house.

(Trial Tr. 581:13-14.) Landrum testified that after Anderson was secured, he went upstairs with Rumbaugh to recover the guns. (Trial Tr. 383:12-14.) Landrum said he and Rumbaugh found the guns in an open closet on the second floor where the guns were in plain view, while Rumbaugh testified that the closet was shut. (Trial Tr. 385:1-4; 538:14-18.) Rumbaugh stated that he did not recall a chest or safe in the closet. (Trial Tr. 539:1-4.) Rumbaugh further testified that he never received information from Grangenois that the guns did not belong to Anderson. (Trial Tr. 541:4-5.) The guns were unregistered. (Trial Tr. 541:17-18.) Landrum testified that he thought the guns belonged to Anderson even though he recovered no evidence that Anderson lived in the home or personal information from the closet. (Trial Tr. 388:7-24.) Landrum testified at Anderson's criminal trial consistent with his testimony here. (Trial Tr. 386:6-7.)

**B.      Unlawful Seizure**

During the mayhem of the arrest, numerous officers responded to the scene. (Trial Tr. 407:22-24.)  While arresting Anderson at the top of his front stairwell, Anderson's dog Rocco came down from the second floor and sat next to his owner.  (Trial Tr. 73:21-22.)  Officer Landrum shot the dog at close range with hollow point bullets.  Anderson either fell or was pushed down the stairs (depending on whose version of the events one believes) and his dog followed him.  While standing guard over his owner, Landrum shot the dog again. (Trial Tr. 348, 351-52.) Landrum's shooting of Anderson's dog in the course of Anderson's arrest constitutes the unlawful seizure claim.

Anderson testified that he owns a Pit bull dog named Rocco. (Trial Tr. 47:6-8.) Anderson told the jury that the dog has never fought another dog, attacked or bitten a person, or had any behavioral problems. (Trial Tr. 49:2-12.) The dog was never used for protection. (Trial Tr. 145:18-22.) Hamilton testified similarly about the dog's personality. She knew of no

behavioral problems with the dog and said he never bit or attacked any person or other dog. (Trial Tr. 181:5-13.) She stated that the dog was well-behaved and obeyed Anderson, though she admitted that she had never seen the dog interact with a group of strangers. (Trial Tr. 197:5-6.) Likewise, Grangenois testified that the dog was a "sweet dog." (Trial Tr. 421:14-15.)

Anderson testified that on March 24, 2011, he had a total of four "beware of dog" signs at his residence in order to warn those who are afraid of dogs that a dog resided in his home.  (Trial Tr. 61:6-21.) Grangenois said that once the officers arrived, she told them that there was a dog inside the house. (Trial Tr. 409:13-14.) He stated that when the officers came into his house, his dog sat next to him as he was being handcuffed. (Trial Tr. 73:21-22.) Before his dog came downstairs, Anderson did not inform the officers that he had a dog because he was afraid of being shot and wanted to follow the officers' direction who had firmly directed him not to move. (Trial Tr. 148:19-21; 149:17-20.) The dog ran past the officers and never tried to attack them. The dog did not growl or snap at them; instead, the dog just sat next to Anderson. (Trial Tr. 74:7-16.) Anderson testified that he had no opportunity to put his dog in a different room before the officers came into the house and that during the arrest he repeatedly asked the officer if he could "put up" his dog – meaning put the dog in a secure room. (Trial Tr. 142:7-14.) He further testified that he repeatedly begged the officer not to shoot his dog and the only response he received repeatedly was "Shut the fuck up!"  (Trial Tr. 74:23-25.) Grangenois testified that when she was outside, she could hear the officers saying "get the dog" and Anderson saying "I can put [the dog] up" and "[the dog] won't attack you." (Trial Tr. 413:3-11; 471:9-15.)

Anderson testified that Landrum then pointed his gun at the dog's face, at which point Anderson begged Landrum not to shoot his dog and to please let him put his dog in another room. (Trial Tr. 74:21-75:2; 147:19-20.) Anderson said that Landrum shot Rocco twice without

warning. (Trial Tr. 76:18-77:10.) Throughout the altercation, no officer asked Anderson to call his dog off or put him away. (Trial Tr. 83:21-24.) Anderson fell down the stairs when the shots went off but knew Landrum had shot the dog because the dog was bleeding very heavily. (Trial Tr. 78:8-19.) Andersen testified that he was pushed down the stairs while handcuffed. (Trial Tr. 77:23-25.) After the first shooting, Rocco followed Anderson down the stairs where Anderson had landed, injured and in handcuffs. (Trial Tr. 78:8-13; 80:8-9.) Landrum began to walk down the stairs toward Anderson who now was lying on the floor at the foot of the stairs. (Trial Tr. 80:23.) At this point, Rocco growled at the officer who had just shot him. (Trial Tr. 80:24.) Landrum then fired two more shots into the dog. (Trial Tr. 81:7-19.) In spite of being shot and bleeding profusely, Rocco ran toward the back of the house directly past all of the officers in the stairwell and surrounding the area, not biting or attacking any of them. (Trial Tr. 82:1-20.) Anderson said that throughout the incident, his dog did not snap at any officer and no other officer made any movement toward the dog. (Trial Tr. 82:10-20.) Although the officers offered to take the dog and have it euthanized (Trial Tr. 186), Hamilton testified that she contacted her nephew who helped her put Rocco in her car and take him to a veterinarian for treatment. (Trial Tr. 186:8-22.) The dog had three gunshot wounds from the hollow point bullets. The veterinarian operated on the dog, who had a shattered leg from one of the shots, and gave Hamilton pills for the dog for treatment. Hamilton paid $699 for the care. (Trial Tr. 187:8-20.)

Anderson testified that after he was arrested, he had no idea whether Rocco was alive. He started having bad dreams and thought the dog was dead. (Trial Tr. 98:1-6.) Once Anderson got home from Cook County Jail, he saw Rocco in a body cast. (Trial Tr. 115:7-14.) Hamilton testified that Anderson's reunion with Rocco was very emotional. (Trial Tr. 191:24-25.) The dog could barely walk and was crying from pain. He could not get up and down the stairs and

Anderson had to set up a bed for him on the first floor for months. (Trial Tr. 98:22-99:2.) Anderson also took his dog to a veterinarian shortly after being released. The veterinarian prescribed the dog pain pills and took his stitches out for which Anderson paid another $234.50. (Trial Tr. 114:1-8; 117:2-3.) Rocco had difficulty walking for almost three months after March 24, 2011. He also could not make it outside to relieve himself, so Anderson would pick him up and take him outside. (Trial Tr. 114:17-23.) The dog could not run or jump initially and he has still not recovered completely from the incident. (Trial Tr. 115:15-24.) Anderson testified that Rocco still walks poorly and he does not expect the dog to recover any further. (Trial Tr. 128:2-8.) The jury saw a video demonstrating how Rocco moves today.

The Defendant Officers' testimony about Anderson's dog and the events leading up to the shooting was drastically different than the testimony summarized above. McEnerney said that as soon as he entered Anderson's house through the back door, the dog started barking. (Trial Tr. 210:13-15.) McEnerney admitted, however, that the dog did not growl or attack him and that he did not feel the need to shoot him at any point throughout the incident, including the moments surrounding the shooting. (Trial Tr. 210:21-25; 213:1-16; 220:5-7.) Nor did the dog lunge at McEnerney as he was handcuffing Anderson. (Trial Tr. 212:8-12.) McEnerney stated that after he handcuffed Anderson, the dog ran toward the group, barking, and appeared aggressive. (Trial Tr. 251:3-8.) On cross, however, the officers admitted that the dog was moving freely throughout the house and had even gone outside and back in the house while the officers were responding. (Trial Tr. 280:15-20.) Anderson did not say anything to the officers upon the dog's arrival to the scene. (Trial Tr. 252:22-24.) McEnerney considered the dog an assailant when it lunged toward Landrum. (Trial Tr. 255:2-9.) In his case report, McEnerney wrote that the dog charged at Landrum upon entry into the house which is inconsistent with the testimony

of other officers (Trial Tr. 229:6-8; 280:15-25.) McEnerney testified that before Landrum shot Anderson's dog, McEnerney heard someone in the hallway yell "get your dog." (Trial Tr. 217:6-13.) McEnerney testified that the second time Landrum shot the dog, he did so from about four feet away. (Trial Tr. 220:14-16.)

Unlike Anderson, Kinnison testified that there were no "beware of dog" signs on Anderson's property on March 24, 2011. (Trial Tr. 301:1-6.) Kinnison also testified that he was not afraid of the dog and that as he walked up to the back door, the dog ran outside (which of course is inconsistent with the testimony from other officers that the dog immediately charged Landrom) (Trial Tr. 229:6-8), chased his tail in the yard, and ran back inside, but did not act threatening. (Trial Tr. 280:15-25.) The dog never lunged at him and Kinnison never felt the need to shoot the dog. (Trial Tr. 281:18-22; 283:22-25.) Kinnison said that although the dog never attacked him, it did become aggressive once the group was at the top of the stairs with Anderson. (Trial Tr. 284:11-12.) He said he nevertheless did not feel the need to shoot, but he told Anderson to control his dog. (Trial Tr. 284:16-24.) Kinnison testified that at the top of the stairs, the dog was growling and agitated. (Trial Tr. 308:21-25.) He further said that Anderson never called the dog or attempted to calm him, nor did he ask for permission to put the dog in another room. (Trial Tr. 309:23-310:6; 332:15-17.) Kinnison confirmed that there were no verbal warnings of impending gunfire. Kinnison stated that the dog charged Landrum and Landrum had to shoot the dog to protect himself. (Trial Tr. 285:19-20; 286:5-6.) Landrum fired two shots, the dog ran down the stairs, turned around, and charged Landrum again. Landrum proceeded to fire two more shots. (Trial Tr. 311:5-14.) Landrum testified that when he was a child, three dogs attacked him and he nearly died. Since then, he has had a certain degree of fear for dogs. (Trial Tr. 343:9-20.) Landrum stated that there were no "beware of dog" signs on Anderson's property,

but that once he got to the back door of the house, he saw the dog growling. (Trial Tr. 347:13-15; 367:9-16.) Landrum pulled his gun out but the dog did not attack him as he entered the house. (Trial Tr. 348:4-13.) Later, the dog charged toward Landrum from the living room in an aggressive manner. Landrum believed the dog was going to bite him so he fired his weapon at the dog. (Trial Tr. 351:16-24.) He shot at the dog twice initially, the dog ran down the stairway, proceeded to come back up, and Landrum fired his weapon at the dog twice more. (Trial Tr. 352:1-22.) In spite of describing his childhood traumatic experience with dogs, Landrum said that his fear of dogs had nothing to do with shooting the dog. (Trial Tr. 354:2-7.) He testified that throughout the altercation, he never heard Anderson give any commands to the dog. (Trial Tr. 380:23-25.) Officers Orlando and Rumbaugh testified similarly.

## LEGAL STANDARDS

### I.    Judgment as a Matter of Law Pursuant to Rule 50(b)

When ruling on a motion for judgment as a matter of law following a jury verdict, courts must consider whether the evidence, viewed in the light most favorable to the non-moving party, is sufficient to support the verdict in their favor. *Venson v. Altamirano*, 749 F.3d 641, 646 (7th Cir. 2014). Courts do not re-weigh the evidence presented at trial or make credibility determinations. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). "Once a jury has spoken, we are obliged to construe the facts in favor of the parties who prevailed under the verdict." *Tate v. Executive Mgmt. Servs., Inc.*, 546 F.3d 528, 531 (7th Cir. 2008) (citations and quotations omitted). Considering the totality of the evidence, courts uphold a jury verdict "as long as it is supported by a reasonable basis in the record." *Nelson v. Katona*, No. 13-1652, 2015 WL 795082, at *1 (7th Cir. Feb. 25, 2015). Although a mere scintilla of evidence is insufficient to sustain a verdict, the Court is not to substitute its view of the contested

evidence in place of the jury's determination. *See Filipovich v. K & R Express Sys., Inc.*, 391 F.3d 859, 863 (7th Cir. 2004). In other words, the standard is steep and "a verdict will be set aside as contrary to the manifest weight of the evidence only if no rational jury could have rendered the verdict." *Willis v. Lepine*, 687 F.3d 826, 836 (7th Cir. 2012) (citations omitted).

## II. Motion for a New Trial

The Defendants face a heavy burden under Rule 59(a) of establishing the need for a new trial. *See Marcus & Millichap Inv. Servs. of Chicago, Inc. v. Sekulovski*, 639 F.3d 301, 313-14 (7th Cir. 2011) ("movants bear a particularly heavy burden because a court will set aside a verdict as contrary to the manifest weight of the evidence only if no rational jury could have rendered the verdict") (citation omitted). "A court may order a new trial if the jury's verdict is against the manifest weight of the evidence, or if for other reasons the trial was not fair to the moving party." *Willis*, 687 F.3d at 836 (quotations omitted). In instances where the issue is whether the Court erred by admitting or excluding evidence, the conclusion "turns on an analysis of the evidentiary ruling in the context of the entire trial record." *Barber*, 725 F.3d at 705 (citation omitted). District courts have wide discretion in determining whether to grant a motion for a new trial, *Mejia v. Cook County, Ill.*, 650 F.3d 631, 634 (7th Cir. 2011), and the Court's evidentiary rulings are given particular deference. *See Jordan v. Binns*, 712 F.3d 1123, 1137 (7thCir. 2013) (evidentiary rulings are reviewed for an abuse of discretion).

## <u>DISCUSSION</u>

## I. Motion for Judgment as a Matter of Law on Malicious Prosecution Claim

The Defendants renew their motion for judgment as a matter of law as to Anderson's malicious prosecution claim pursuant to Rule 50(b). Pursuant to Rule 50, "the jury's verdict must stand unless the officers can show that no rational jury could have brought in a verdict against

[them]." *Von der Ruhr v. Immtech Int'l. Inc.*, 570 F.3d 858, 866 (7th Cir. 2009). Under Illinois law, the elements of a malicious prosecution claim are: "(1) the defendants commenced judicial proceedings, (2) for which there was no probable cause, (3) the proceeding[s] were instituted or continued maliciously, (4) the proceedings were terminated in the plaintiff's favor, and (5) the plaintiff sustained an injury." *Saunders-El v. Rhode*, 778 F.3d 556, 561 (7th Cir. 2015). The Defendants attack the verdict on four grounds: (1) Anderson failed to show the Defendants lacked probable cause to initiate the prosecution; (2) Anderson failed to demonstrate that Kinnison participated in the prosecution; (3) Anderson failed to establish malice by either Kinnison or McEnerney; and (4) the Illinois Local Governmental and Governmental Tort Immunity Act, 745 ILCS 10, protects the Defendant Officers from liability.

The trial rested significantly upon credibility and fact determinations due to the significantly divergent facts presented by the parties. This Court cannot say that the verdict must be disturbed based upon the facts presented here. A reasonable jury could question whether the officers had probably cause to charge Anderson with the weapons offense. If the Court construes the facts in favor of the plaintiff, as it must based on this verdict, there is a set of facts that support the lack of probable cause and the furthering of that case at preliminary hearing.

### A.    Probable Cause

The Defendants argue that Anderson's malicious prosecution claim must fail as a matter of law because, even when viewing the evidence in the light most favorable to Anderson, the undisputed facts established that the Defendant Officers had probable cause to charge Anderson with unlawful possession of a firearm without a FOID card. The Defendants maintain that the undisputed facts that (1) the Defendant Officers heard that Anderson had guns in the house in the 911 call, (2) the Defendant Officers found guns on the second floor of the residence, (3) the guns

were unregistered, and (4) the only other individual residing in the house appeared to live on the first floor established probable cause to charge Anderson for the guns.

The facts, however, are not as clear as Defendants would suggest. If the jury believed the Plaintiff's version of the facts, it could reasonably have concluded the following: the officers received a 911-call that a woman was being held hostage in a house and that there were guns in the house; the officers were not told that the guns were being used; when the officers arrived on the scene, there was no hostage situation and, in fact, the victim was outside the house, having left of her own accord and was not injured; the officers entered the house and did not see weapons in plain view or observe any weapons on Anderson; Anderson was compliant and cooperative; the officers knew by the time they arrested Anderson that at least one other (and possibly two) adults lived in the house; the officers had no information about whether Anderson or any other adult in the house was allowed to possess a weapon; and, within minutes of the officers' arrival, the house was vacated by both Anderson, who was arrested, and his girlfriend, who was drunk and admitted to calling police to get a ride home. After the victim was secured and outside the house and Anderson was in the squad car, in other words when the entire situation was under control, the officers did not ask him whether he or anyone else in the house had weapons. Only after the scene was calm did the officers search upstairs and retrieve two 30-year-old shotguns from a locked closet. They did not retrieve any other identification from the closet to suggest that the weapons were Anderson's. Based on this set of facts, if believed by the jury as the fact finder, a reasonable police officer under all of the facts and circumstances should have inquired more about the ownership of the weapons before concluding that there was probable cause to charge Anderson with illegally possessing them.

A police officer only has probable cause when there are "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person . . . in believing, in the circumstances shown, that the suspect has committed" a crime. *Holland v. City of Chicago*, 643 F.3d 248, 254 (7th Cir. 2011) (citation omitted). In making the probable cause determination, the Court "steps into the shoes of a reasonable person in the position of the officer." *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). For purposes of a malicious prosecution claim, the pertinent time for making the probable cause determination is "the time when the charging document is filed, rather than the time of the arrest." *Holland*, 643 F.3d at 254. In determining the existence of probable cause in a malicious prosecution case, "[i]t is the state of mind of the person commencing the prosecution that is at issue—not the actual facts of the case or the guilt or innocence of the accused." *Sang Ken Kim v. City of Chicago*, 368 Ill. App. 3d 648, 654 (Ill. App. Ct. 2006). Answering the question of whether a reasonable jury could find that the Defendants lacked probable cause to charge Anderson is particularly difficult because of the collision of two basic principles:

> On the one hand, it does not take much to establish probable cause. The officers must have more than a bare suspicion that they have the right guy, but they need not have enough evidence to support a conviction or even to show that their belief is more likely true than false . . . On the other hand, however, the probable cause standard does not trump [the Court's] duty to defer to a jury's findings . . . Instead [the Court] make[s] all reasonable credibility determinations and inferences in favor of the [non-moving party], asking whether under their version of the facts a reasonable officer could conclude that there was probable cause . . .

*Fox v. Hayes*, 600 F.3d 819, 833-34 (7th Cir. 2010) (internal citations and quotation marks omitted).

At trial, there were significant challenges to the credibility of the officers. For example, many of the versions of what happened to the dog were disputed by the officers who were a

matter of feet from each other at the scene. Further, numerous officers testified that the complainant was not drunk at the time of the incident; yet, both she and the plaintiff confirmed that she was highly intoxicated. Each officer gave credibility to the complainant's statement that there were guns in the house, yet none found her credibility to be lacking based on her own admitted intoxication. Each officer also gave the complainant's statement credibility in spite of the scene not at all reflecting her initial allegations: she said she was being held hostage; they observed her outside of the house having left of her own accord; she said Anderson was holding her hostage and behaving violently; when the officers entered the house, Anderson had no guns and was compliant. Within seconds of being on the scene, the officers' initial information was refuted by what they observed. The jury clearly did not credit the officers' testimony in reaching its finding of no probable cause and it was not required to do so under the law. *See Fox*, 600 F.3d at 834 (in making probable cause determination in malicious prosecution case, jury not required to believe testimony of arresting officers); *see also Askew v. City of Chicago*, 440 F.3d 894, 896 (7th Cir. 2006) (observing that jury would have work to do if factual inconsistencies were material to finding of probable cause).

The Defendant Officers ultimately charged Anderson with possession of a firearm without a FOID card in violation of 430 ILCS 65/2(a)(1). The Illinois statute makes it unlawful for a person to "possess any firearm . . . within this State without having in his or her possession a Firearm Owner's Identification Card" in his or her name. 430 ILCS 65/2(a)(1). If the Court accepts the facts presented to the jury in the light most favorable to Anderson, accepting his version of the disputed facts, and construing all discrepancies in his favor, a jury could reasonably find that the officers lacked probable cause and should have made additional inquiry prior to charging him. The defense argued that the reasonable inferences based on the facts

presented showed that the officers charged Anderson with the weapons charge once they shot his dog and he was injured at the bottom of the stairwell. The jury could have reasonably inferred such motivation based on the facts that were presented to them and crediting the Plaintiff, his former girlfriend, and his sister (all of whom were consistent with each other) and discrediting the conflicting testimony from the officers.

Probable cause is evaluated objectively, *see Huff v. Reichert*, 744 F.3d 999, 1007 (7th Cir. 2014), and does not allow the defendants to ignore the full context of the circumstances known to them. *Guzell v. Hiller*, 223 F.3d 518, 520 (7th Cir. 2000) (noting that police "can't close their eyes" to information that undercuts probable cause); *accord BeVier v. Hucal*, 806 F.2d 123, 128 (7th Cir. 1986) ("A police officer may not close her or his eyes to facts that would help clarify the circumstances of an arrest. Reasonable avenues of investigation must be pursued especially when, as in this case, it is unclear whether a crime has even taken place."). Indeed, a police officer cannot consciously disregard information that would "bring clarity to a confusing situation." *Mahnke v. Garrigan*, 428 F. App'x 630, 635 (7th Cir. 2011) (citing *Askew*, 440 F.3d at 895-96)). Based on the facts here, a jury could have found the officers' failure to further investigate the crime unreasonable. *See id.; BeVier*, 806 F.2d at 128 (unreasonable to not make additional inquiries before arrest where information could have been easily obtained). The jury clearly believed the complainant was intoxicated and angry at her boyfriend when the officers arrived at the scene. Based on these findings and the totality of the circumstances, the jury could also have concluded that a reasonable officer would have been more likely to challenge the validity of her statements upon recognizing that the intoxicated and angry complainant had a motivation to lie and incriminate her boyfriend; and that, in light of such observation, a reasonable officer would have made further inquiry.

Moreover, although probable cause exists "[o]nce a reasonably credible witness informs an officer that a suspect has committed a crime," *Abbott v. Sangamon County, Ill.*, 705 F.3d 706, 716 (7th Cir. 2013) (internal quotation omitted), the officer should conduct further investigation where " 'information from or about a [putative] victim of crime would lead a reasonable officer to be suspicious". *Spiegel v. Cortese*, 196 F.3d 717, 724 (7th Cir. 1999) (*quoting Hebron v. Touhy*, 18 F.3d 421, 423 (7th Cir. 1994). Here, the jury could plausibly have found that no such credible witness existed and that the officers were unreasonable in failing to conduct further investigation prior to charging Anderson. The putative victim testified at trial, and her plaintiff-former boyfriend corroborated, that she was visibly intoxicated by the time the officers arrived at the scene and that she was out of the house and not being restrained as she previously indicated in her call to 911. Moreover, witnesses also testified that—contrary to the putative victim's initial 911 call—there were no guns when the police arrived. Based on these facts, the jury may reasonably have found that the officers did not have probable cause for the prosecution. And, because the usually generous probable cause standard "does not trump our duty to defer to a jury's findings," *Id.* at 834 (citing *Newsome v. McCabe*, 319 F.3d 301, 303-04 (7th Cir. 2003)), this Court will not disturb the jury's finding on this issue. *See U.S. v. Cardona–Rivera*, 904 F.2d 1149, 1152 (7th Cir.1990) (where there are clearly conflicts of testimony, the question of credibility and weight of the evidence is left to the jury unless the jury's determination rests on "exceedingly improbable testimony").

### B.    Commence or Continue Criminal Proceedings

The Defendants next contend that the judgment in favor of Anderson on his malicious prosecution claim must be reversed as to Kinnison because Kinnison played no role in Anderson's criminal proceedings. *See Saunders-El*, 778 F.3d at 561 (Illinois malicious

prosecution elements include that defendants commenced judicial proceedings and the proceedings were instituted or continued maliciously). In Illinois, criminal proceedings are commenced by the filing of a complaint, an indictment, or an information. *See* 725 ILCS 5/111-1; *Logan v. Caterpillar, Inc.*, 246 F.3d 912, 922 (7th Cir. 2001). Illinois law requires that, in order to commence or continue a criminal proceeding, the defendant must have initiated the criminal proceeding or "his participation in it must have been of so active and positive a character as to amount to advice and cooperation." *Id.* Here, the Defendants argue that Kinnison cannot be deemed to have commenced or continued criminal proceedings against Anderson because he did not file the complaint nor did he testify against Anderson at his criminal trial.

The Court denies this basis because a reasonable jury could conclude, based on the facts before it, that Kinnison commenced the criminal proceedings against Anderson. McEnerney testified that he and Kinnison operated as the "paper car" on March 24, 2011, meaning that they were tasked with filling out all police reports for the day. Although McEnerney signed the actual criminal complaint against Anderson on the gun charges, Kinnison testified that he helped prepare the arrest reports with McEnerney and that he reviewed and signed off on the reports. Kinnison further testified that he was prepared to testify as a witness at Anderson's criminal trial had he been called as a witness. Such participation was enough for the jury to conclude that Kinnison participated in Anderson's criminal prosecution. *See, e.g.*, *Padilla v. City of Chicago*, 932 F. Supp. 2d. 907, 929 (N.D. Ill. 2013) ("no question" that defendant officers commenced or continued prosecution where one officer signed, "and therefore attested to the accuracy of," police reports and attempted to serve as a witness at criminal trial and other officer signed two police reports). It is not necessary for a police officer to have signed a criminal complaint to satisfy this requirement. *See Rodgers v. Peoples Gas, Light & Coke Co.*, 315 Ill. App. 3d 340,

348 (2000) ("[l]iability for malicious prosecution is not confined to situations where the defendant signed a complaint"). Here, if the jury accepted Anderson's version of the events, then it reasonably could have concluded that the Defendant Officers lied on their arrest reports and case reports when they knew those reports would be sent to the state's attorney. Such evidence was enough for a jury to conclude that Kinnison is liable for commencing the criminal proceedings against Anderson. *See Reed v. City of Chicago*, 77 F.3d 1049, 1053 (7th Cir. 1996) (malicious prosecution can lie where officers gave knowing misstatements to the prosecutor). Accordingly, the Court denies this basis for judgment as a matter of law.

## C.    Malice

The Defendants' argument that Anderson failed to present evidence of malice on behalf of Kinnison and McEnerney fares no better. "Malice" in the context of malicious prosecution means that the officers who initiated the prosecution had "any motive other than that of bringing a guilty party to justice." *Aleman v. Vill. of Hanover Park*, 662 F.3d 897, 907 (7th Cir. 2011) (quoting *Carbaugh v. Peat*, 40 Ill. App. 2d 37, 189 N.E.2d 14, 19 (1963)). The evidence in this record could reasonably suggest to a jury that the Defendant Officers charged Anderson with possession of a firearm without a FOID card not because they believed he was guilty and wanted to bring him to justice, but for some other reason—such as perhaps covering up for Landrum shooting Anderson's dog. Again, taking the version of disputed facts most favorable to Anderson, a jury could reasonably find that the Defendant Officers broke into Anderson's closet to recover the guns and then charge him with possessing those guns even if it was unsupported by probable cause.

Malice may be inferred from "want of probable cause when the circumstances are inconsistent with good faith by the prosecutor." *Williams v. City of Chicago*, 733 F.3d 749, 760

(7th Cir. 2013). Here, the jury heard discrepancies not only in the Defendant Officers' testimony when compared to Anderson's, but also between the Defendant Officers themselves. Viewing the record in the light most favorable to Anderson at this stage, the Court cannot say that a reasonably jury could not conclude that McEnerney and Kinnison did not act with malice in prosecuting Anderson.

### D. Tort Immunity Act

Defendants next contend that this Court should have instructed the jury regarding the Illinois Tort Immunity Act, 745 ILCS 10/2-202, *et seq*. The Act, however, merely "codifies the malicious prosecution standard." *Holland* , 643 F.3d at 255 (citing 745 ILCS 10/2–208); *see also Reno v. City of Chicago,* 2012 WL 2368409, at *6 (N.D. Ill. 2012); *Cruz v. City of Chicago*, 2013 WL 3864234, at *6 (N.D. Ill. 2013). Section 10/2–208 provides that a "public employee is not liable for injury caused by his instituting or prosecuting any judicial or administrative proceeding within the scope of his employment, *unless he acts maliciously and without probable cause.*" 745 ILCS 10/2–208 (emphasis added). Here, Plaintiff's allegations fall squarely within this exception.

In reviewing the propriety of jury instructions, this Court considers the instructions as a whole to determine whether "they correctly and completely informed the jury of the applicable law." *Bogan v. City of Chicago*, 644 F.3d 563, 568 (7th Cir. 2011) (internal quotation marks omitted). If the instruction fails "to convey the correct message to the jury reasonably well," the Court will consider whether the misleading instruction prejudiced the complaining party. *Dawson v. N.Y. Life Ins. Co.*, 135 F.3d 1158, 1165 (7th Cir. 1998). Parties are entitled to a "correct statement of the law," but the Court need not "deliver instructions describing all valid legal principles." *Gehring v. Case Corp.*, 43 F.3d 340, 343 (7th Cir. 1994).

In this case, the instructions correctly and completely informed the jury of the applicable law and, more importantly, the complaining party suffered no prejudice as a result of the instructions that were given. At trial, the Court gave the following jury instruction:

> Plaintiff Jerome Anderson has the burden of proving each of these following four things by a preponderance of the evidence:
>
> First, that the defendants commenced or continued a criminal proceeding against the plaintiff without probable cause;
>
> Second, that the defendants acted with malice in commencing or continuing that criminal proceeding;
>
> Third, that the criminal proceeding terminated in favor of the plaintiff in a manner indicating that the plaintiff was innocent;
>
> And, fourth, that the plaintiff suffered damages as a proximate cause of that criminal proceeding.

(Trial Tr. 674:16-25.) While this instruction may have been given with respect to the malicious prosecution claim, it is materially similar to the requirements of the Tort Immunity Act and the jury was adequately instructed as to the salient legal issues. Defendants' motion for judgment as a matter of law, therefore, is also denied on this ground.

## .II.    Motion for a New Trial

The Defendants argue that a number of evidentiary errors at trial warrant the imposition of a new trial on Anderson's malicious prosecution and unlawful seizure claims. A new trial based on an error in the admission of evidence is granted only in "extraordinary situations." *Shick v. Ill. Dep't of Human Servs.*, 307 F.3d 605, 611 (7th Cir. 2002). Whether there was reversible error "turns on an analysis of the evidentiary ruling in the context of the entire trial record." *Barber*, 725 F.3d at 705. The Defendants face a particularly uphill battle here because the outcome of the trial depended upon the resolution of relatively simple issues from highly disputed factual testimony. *Whitehead v. Bond*, 680 F.3d 919, 925 (7th Cir. 2012). An

evidentiary error warrants a new trial only if the error affected a substantial right of a party, which means that there is a significant chance that the error affected the jury's verdict. *See Horvath v. West Bend Mut. Ins. Co.*, 534 F. A'ppx 552, 556 (7th Cir. 2013).

In an unreasonable seizure case, "the use of deadly force against a household pet is reasonable only if the pet poses an immediate danger and the use of force is unavoidable." *Viilo v. Eyre*, 547 F.3d 707, 709 (7th Cir. 2008). In finding for Anderson on his claim, the jury necessarily concluded that Landrum's use of force against Anderson's dog was unreasonable. That said, the Court will only grant a new trial if the alleged errors "substantially sway[ed]" the jury in reaching its verdict. *Barber*, 725 F.3d at 715; *see also E.E.O.C. v. Mgmt. Hospitality of Racine, Inc.*, 666 F.3d 422, 440 (7th Cir. 2012) (evidentiary errors warrant new trial "only when a significant chance exists that they affected the outcome of the trial"). The Defendants contend that this standard is met based on four different evidentiary errors by the Court: (1) Anderson asking Landrum whether he was placed on desk duty after the incident; (2) allowing Grangenois to testify about what she heard while she was outside Anderson's house; (3) allowing Grangenois to testify that the Defendant Officers allowed her to drive home; and (4) excluding testimony from Grangenois that Anderson owned a handgun. Because none of the Court's rulings on the challenged evidence were erroneous, the Court denies the Defendants' motion for a new trial on Anderson's unlawful seizure claim and dismisses as moot the motion for a new trial on Anderson's malicious prosecution claim based on the Court's ruling above.

### A.     Asking Landrum Whether he was Placed on Desk Duty

Prior to trial, the Court granted the Defendants' Motion in Limine No. 1, which sought to bar reference to any disciplinary action taken against the Defendant Officers. (*See* Dkt. No. 45.) During Anderson's direct adverse examination of Landrum, Anderson asked Landrum: "Sir,

after this incident, you were transferred to desk duty, weren't you, fugitive apprehension section?" (Trial Tr. 355:4-5.) Before Landrum responded, the Defendants objected to the question and the Court held a sidebar on the issue, ultimately sustaining the objection and instructing the jury that "you need to disregard the question itself and not even consider it in your deliberations. The question about the transfer has nothing to do with this case or your deliberations." (Trial Tr. 359:13-17.) The Defendants argue that notwithstanding the fact that Landrum never answered the question, the jury was "clearly swayed" by the insinuation that Landrum was placed on desk duty due to the shooting of Anderson's dog. (Dkt. No. 76, Motion for New Trial at 5.)

This is not a basis for a new trial. First and foremost, Landrum never answered the question. The Court sustained the Defendants' objection immediately after Anderson posed the question to Landrum. Furthermore, the Court specifically instructed the jury to "disregard the question itself and not even consider it in [the jury's] deliberations." *See Wilson v. City of Chicago*, 758 F.3d 875, 885 (7th Cir. 2014) (courts "presume that juries follow the instructions given them by the court"). The Defendants' citation to *Barber* for the proposition that "the formulaic recitation of a pro forma limiting instruction may not suffice to cure an error as it may fail to instruct the jury meaningfully as to what it legitimately may do with the evidence," 725 F.3d at 717, is misplaced. Here, there was no evidence to limit. Landrum did not respond to the question and the Court acted quickly to cleanse any inference the question may have raised. Moreover, the Court offered to issue an additional limiting instruction if the Defendants believed it necessary, but the Defendants never proposed one.[1] (Trial Tr. 453:14-20.) The Court did not err by not giving a limiting instruction sua sponte. *See Whitehead*, 680 F.3d at 931. Even without

---

[1] In their Reply brief, the Defendants suggest that they attempted to submit a limiting instruction on the last day of trial as the Court was instructing the jury. This is not supported by the transcript. Instead, the Defendants attempted to discuss the Tort Immunity Act after the Court began instructions. (Trial Tr. 664:12-18.)

the additional instruction, however, the Court instructed the jury that the case had nothing to do with whether Landrum was transferred or not after the incident. Nothing in the record indicates that the jury was swayed by Anderson's unanswered question. *See id.*

**B. Grangenois's Testimony on what she Heard While Outside**

The Defendants next claim that the Court erred by allowing Grangenois to testify about what she heard the Defendants and Anderson say while she was outside the house. At trial, Grangenois testified that she could hear yelling coming from inside the house as the officers entered. Specifically, she stated that she heard the Defendants say "Get the dog. Get the Dog." She also said she heard Anderson say "I can put him up. I can grab the dog. Just wait. Just wait." (Trial Tr. 413:8-11.) After initially sustaining the Defendants' objection to Grangenois's testimony as hearsay, the Court reversed its ruling and allowed the testimony because it was not offered for the truth of the matter asserted. (Trial Tr. 450:23-451:10.) Later, after Grangenois had testified, the parties stipulated that "[i]f Tina Grangenois . . . were to continue testifying in this matter, she would state that prior to hearing the first gunshot, she heard Jerome Anderson say the following: 'Let me put my dog up. There's room right there. Just let me move him. He won't attack you.' " (Trial Tr. 471:9-15.) The Defendants contend that Grangenois's testimony should have been excluded as inadmissible hearsay.

As the Court thoroughly explained on the record, "testimony to what one heard, as distinct from testimony to the truth of what one heard, is not hearsay." (Trial Tr. 450:24-451:1); *Junior v. Anderson*, 724 F.3d 812, 814 (7th Cir. 2013) (plaintiff's testimony that he heard prisoners request that defendant let them out of their cells was not directed towards the truth of anything they said, "such as that the prisoners in the other tier wanted to be released from their cells"); *see also, e.g.*, *Harper v. Bolton*, No. 13 CV 08595, 2014 WL 3586201, at *3 n.8 (N.D.

Ill. July 21, 2014). Here, Grangenois's testimony was similarly not directed toward the truth of Anderson's statements. She was not testifying that Anderson actually could move the dog, put him in another room, or that the dog actually would not attack the officers. Instead, she merely testified about what she heard both parties say on scene, and that testimony was not hearsay.

Moreover, even if Anderson's statements to the officers were hearsay, they qualify as excited utterances under the circumstances. Pursuant to Federal Rule of Evidence 803(2), hearsay is admissible as an excited utterance if the statement made was related to a startling event and made while the declarant was under the stress of the excitement that caused the statement to be uttered. Fed. R. Evid. 803(2). "For an out of court statement to qualify under the excited utterance exception: (1) a startling event must have occurred; (2) the declarant must make the statement under the stress of the excitement caused by the startling event; and (3) the declarant's statement relates to the startling event." *United States v. Zuniga*, 767 F.3d 712, 716 (7th Cir. 2014). All three requirements are satisfied here. Anderson testified that he was unaware the officers were coming to his home until they were at his door, that they pointed their guns at him upon entry, and that that Landrum pointed a gun at his dog's head. Accepting this testimony as true, this was a startling event. *See id.* at 715-16 (statement that individual possessed a gun and was holding it to another person's head could qualify as an excited utterance). Additionally, the evidence presented at trial showed that the discussion between Anderson and the officers about the dog took place contemporaneously with the officers' entry into Anderson's house. *See United States v. Joy*, 192 F.3d 761, 766 (7th Cir. 1999) (admitting under the excited utterance exception declarant's statement that was made a few minutes after witnessing an exciting event). Finally, Anderson's statements about "putting his dog up" relate to the officers' surprise presence. The Court's conclusion is bolstered by the fact that Grangenois testified she heard the

parties yelling, as opposed to just speaking. *See Zuniga*, 767 F.3d at 716 (declarant yelling is more consistent with an excited utterance than whispering). Because Grangenois's testimony about what Anderson said to the officers was not hearsay and, even if it was, Anderson's statements were excited utterances, the Court denies this basis for a new trial.

### C. Grangenois's Testimony that the Officers Allowed her to Drive Home

The Defendants also claim that the Court erred by allowing Grangenois to testify that the officers on scene allowed her to drive home when she thought she was intoxicated. Grangenois testified that she did not specifically ask the officers if it was okay for her to drive home, but that she told them she was intoxicated. (Trial Tr. 424:2-7.) Anderson proceeded to ask Grangenois if she believed that she was visibly intoxicated to someone observing her, at which point the Court sustained the Defendants' speculation objection. (Trial Tr. 424:8-18.) Anderson altered his question and asked Grangenois if she believed she was intoxicated when she drove home. At this point, the Court allowed her to answer over the Defendants' renewed speculation objection. (Trial Tr. 424:21-425:8.) Grangenois additionally testified that the officers knew she was driving the night of the incident and the Defendants did not object to this testimony. The Defendants now contend that the Court erred in allowing this testimony because it served only to inflame the jury.

In their motion, the Defendants appear to argue that Grangenois's testimony regarding whether she thought she was intoxicated and that the officers allowed her to drive home was irrelevant to any of the issues at trial. The Court finds the argument ironic in light of the fact that Defendants elicited testimony from numerous officers who stated that when they met Grangenois at the scene she was not intoxicated. Therefore, if she then testified that they allowed her to drive home, it corroborates their testimony. Why this would be irrelevant to defendants is

baffling. Regardless, it was relevant. Whether Grangenois was intoxicated at the time the officers encountered her was relevant to their analysis of probable cause as discussed above and also highly relevant to Anderson's version of the offense. Because the case was a battle of credibility, any statement made by a witness and corroborated by another made a significant impact on the jury. Interestingly, at trial, both parties had subpoenaed Grangenois to testify and yet she was not located. The trial was nearly completed when she arrived surprisingly (to both parties) in the courtroom the day she had been subpoeanaed. At that point, the Court asked which party wanted to call her as a witness. (Trial Tr. 324.) She was the proverbial wildcard – both parties subpoenaing her for trial. Plaintiff called her and she testified entirely consistently with Plaintiff's testimony in spite of the fact that they are no longer in a relationship.[2] Her testimony had a significant impact on the conclusion that the Plaintiff was a truth-teller in that she corroborated his entire version of the offense.

First, the Defendants never made this argument at trial and have therefore waived it. *See Wilson*, 758 F.3d at 883 ("When a defendant does not object to the admission of evidence during the trial, the objection is waived and cannot be raised for the first time in a motion for new trial or on appeal."). The Defendants' speculation objections during Grangenois's testimony at trial do not save their relevance argument brought now. *See Naeem v. McKesson Drug Co.*, 444 F.3d 593, 610 (7th Cir. 2006) ("Neither a general objection to the evidence nor a specific objection on other grounds will preserve the issue for review."). In this case, the Defendants did not raise their current objection to Grangenois's cited-to testimony during the trial itself. The Defendants have therefore waived their relevance objection to Grangenois's testimony about her intoxication and driving home from Anderson's house on March 24, 2011. The Court denies this basis for a new

---

[2] The only aspect of Grangenois's testimony where she diverged from Anderson's version of the events was that she testified that Anderson slapped her, while Anderson testified he only grabbed and shook her. Both stated that Grangenois was highly intoxicated and Anderson did not want her to drive home.

trial not only because of the foregoing reasons, but also because the Defendants elicited testimony regarding Grangenois's intoxication from the Defendant Officers throughout trial, (Trial Tr. 245:7-10; 257:25; 317:15-25), and because the Defendants have made no showing that this testimony affected the jury's verdict for either Anderson's unlawful seizure claim.

### D. Barring Testimony from Grangenois that Anderson Owned a Handgun

Finally, the Defendants argue that the Court erred by excluding testimony from Grangenois that Anderson owned a handgun. At trial, the Defendants questioned Grangenois on if she was aware that Anderson had a handgun. Anderson objected to the question and the Court sustained the objection. The Defendants contend that the Court should have allowed them to question Grangenois about her knowledge of a handgun because the basis of her 911 call was that Anderson had guns in the house.

The Court denies this basis for a new trial. First and foremost, in neither their motion for a new trial nor their reply do the Defendants cite to a single case standing for the proposition that Grangenois's subjective knowledge of any guns in the house would have any bearing on a probable cause analysis from the police officer's perspective. Accordingly, they have waived the argument. *See United States v. Useni*, 516 F.3d 634, 658 (7th Cir. 2008) (failure to cite relevant authority constitutes a waiver because "[i]t is not the obligation of this court to research and construct the legal arguments open to parties, especially when they are represented by counsel"). Waiver aside, the Defendants have offered no reason why Grangenois's knowledge of whether or not Anderson had a handgun would be relevant to the malicious prosecution analysis. At trial, it was undisputed that the Defendant Officers received a 911 call stating that Anderson had guns in the house. It was further undisputed that upon the Defendant Officers' arrival, Grangenois told them there were guns locked in a closet on the second floor of the house. These were the facts

the Defendant Officers were armed with when instituting criminal proceedings against Anderson. *See Holland*, 643 F.3d at 254 (police officer has probable cause when there are "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person . . . in believing, in the circumstances shown, that the suspect has committed" a crime). Grangenois never testified that she told any of the Defendant Officers that Anderson had a handgun and her subjective knowledge of that fact is irrelevant to analyzing whether the Defendant Officers had probable cause to charge Anderson with possession of a firearm without a FOID card.

Based on the parties' widely divergent versions of the event offered at trial, Anderson's unlawful seizure claim boiled down to a credibility determination. The jury was entitled to credit Anderson's version. *See Bogan*, 644 F.3d at 572 (7th Cir. 2011) ("[c]redibility determinations . . . are within the province of the jury"). Viewing the alleged errors in the context of the entire evidentiary record, the Court denies the Defendants' motion for a new trial.

## III. Motion for Remittitur

### A. Unlawful Seizure

The Defendants claim that the award of $230,000 for Anderson's unlawful seizure claim for the shooting of his dog has no rational basis to the evidence presented at trial. The Defendants argue that the award must have been based on passion and sympathy as opposed to actual evidence of harm because Anderson presented only $234.50 in veterinary bills, never sought psychological treatment as a result of his dog being shot, and he testified only cursorily and generally about his emotional suffering as a result of the incident. The Court disagrees. Because Anderson provided ample testimony regarding his pain and suffering stemming from Landrum's shooting of his dog, the jury's compensatory damage award was rationally connected to the evidence and the Court denies the Defendants' motion for remittitur.

To determine whether an award of compensatory damages is excessive, courts consider "whether the damages awarded (1) were monstrously excessive; (2) had no rational connection between the award and the evidence; and (3) were roughly comparable to awards made in similar cases." *E.E.O.C. v. AutoZone, Inc.*, 707 F.3d 824, 833 (7th Cir. 2013). The Court must accord proper deference to the jury's verdict. *See Farfaras v. Citizens Bank & Trust of Chicago*, 433 F.3d 558, 566 (7th Cir. 2006); *see also, e.g.*, *Adams v. City of Chicago*, No. 06 CV 4856, 2014 WL 2621115, at *3 (N.D. Ill. June 10, 2014) ("A jury's determination of compensatory damages must be accorded substantial deference.") (quoting *Ramsey v. Am. Air Filter Co.*, 772 F.2d 1303, 1313 (7th Cir. 1985)).

Relevant to Anderson's unlawful seizure claim, the Court provided that damages could be awarded for veterinary expenses, physical and mental/emotional pain and suffering that Anderson experienced as a result of the incident, and physical and mental/emotional pain and suffering that Anderson is reasonably certain to experience in the future. The Court further instructed the jury that "[n]o evidence of the dollar value of physical or mental/emotional pain and suffering has been or needs to be introduced. There is no exact standard for setting the damages to be awarded on account of pain and suffering." (Trial Tr. 578:23-579:10.) In making their motion and seeking a remittitur to $234.50, the Defendants ignore the detailed testimony that Anderson offered at trial on the damages issue in addition to the cost of the veterinary bills.

Anderson testified that he had the dog since the dog was two months old, meaning he had the dog for approximately two years on March 24, 2011. Anderson also testified that he trained the dog and performed activities with the dog daily. The jury reasonably could have concluded that Anderson had a deeper emotional connection with the dog than an individual would have with an inanimate object comprising an unlawful seizure of property case. On the day of the

32

incident, Anderson testified that he watched Landrum fire his weapon at the dog four times while the dog was not being aggressive. *See Tate*, 546 F.3d at 531 (court accepts non-movant's version of the facts when considering post-trial motions). As he described the sequence of events leading up to the shooting, Anderson choked up. *See Harvey v. Office of Banks and Real Estate*, 377 F.3d 698, 715 (7th Cir. 2004) ("It is within the jury's province to evaluate the credibility of witnesses who testify to emotional distress, and [the Court] shall not disturb those credibility determinations."). Anderson told the jury that after the initial two gunshots, he fell to the floor and the dog was bleeding heavily on top of him. After he was arrested, Anderson thought his dog was dead and he had nightmares about the event. He came home to find his dog in a body cast, and Hamilton testified that the reunion between Anderson and the dog was very emotional. The dog could not walk for months after the shooting and Anderson had to carry him up and down the stairs and outside so the dog could relieve itself. Anderson also said he had to give the dog pain pills for months after the incident. Now over three years removed from the shooting, Anderson said that there are still activities that the dog cannot do. The dog limps. Anderson cannot take the dog running like he used to. (Trial Tr. 115:15-24.) Anderson also said he does not expect the dog to further recover, and the jury was instructed to consider future emotional pain and suffering stemming from the incident. Taking this testimony into consideration, the jury could have found that the event seriously affected and was traumatic for Anderson. Accordingly, the compensatory damage award was not "monstrously excessive" and was rationally connected to the evidence. *See Hendrickson v. Cooper*, 589 F.3d 887, 892-93 (7th Cir. 2009) ("required 'rational connection' between the evidence and the award does not imply mathematical exactitude, especially where the compensatory damages are for pain and suffering"). Contrary to the Defendants' position, Anderson did not need to present evidence that he sought

psychological treatment as a result of the shooting in order to justify the award. *See Tullis v. Townley Eng'g & Mfg. Co., Inc.*, 243 F.3d 1058, 1068 (7th Cir. 2001) ("award for nonpecuniary loss can be supported, in certain circumstances, solely by a plaintiff's testimony about his or her emotional distress").

Moreover, the Defendants did not provide any directly comparable cases upon which to base a decision that the jury's verdict here was monstrously excessive. *See generally Deloughery v. City of Chicago*, 422 F.3d 611 (7th Cir. 2011) (affirming remittitur to $175,000 in Title VII case); *Thompson v. Mem'l Hosp. of Carbondale*, 625 F.3d 394 (7th Cir. 2010) (remittitur from $500,000 to $250,000 warranted in Title VII case); *Cooper v. Dailey, et al.*, 07 CV 2144, 2012 WL 9500661 (N.D. Ill. Aug. 8, 2012) (remittitur from $450,000 to $125,000 in case stemming from unlawful search). The Court, however, found two cases with similar circumstances and similar awards. *See generally Russell v. City of Chicago*, 10 C 525, 2011 WL 7178888 (N.D. Ill. Aug. 18, 2011) ($330,000 compensatory damage award where police officers shot and killed plaintiffs' nine-year-old dog and put a gun to one of the plaintiff's heads); *Fuller v. Vine*, C922412, 1998 WL 1017037 (N.D. Cal. Dec. 18, 1998) ($143,000 compensatory damage award where police officers shot and killed plaintiffs' eleven-year-old dog); *see also Tullis*, 243 F.3d at 1069 (when comparing to past awards, courts take inflation into account). Even some of the cases cited by the Defendants are not "monstrously" lower than the damage award here, "although such comparisons are rarely dispositive given the fact-specific nature of damages claims." *Hendrickson*, 589 F.3d at 892. The Court's role is "not to fit this case into a perfect continuum of past harms and past awards" but rather to ensure that "the instant award was not so beyond the pale as to constitute an abuse of discretion." *Thompson*, 625 F.3d at 409. Here, the

Defendants have not demonstrated that the jury's $230,000 award for Anderson's unlawful seizure claim should be subject to remittitur. The Court therefore denies the Defendants' motion.

### B.    Malicious Prosecution

The Defendants likewise argue that there was insufficient evidence to support the jury award of $150,000 on Anderson's malicious prosecution claim. Again, a jury's award of compensatory damages must be afforded proper deference. *Farafas*, 433 F.3d at 566. Malicious prosecution permits damages for confinement imposed pursuant to legal process. *Heck v. Humphrey*, 512 U.S. 477, 484 (1994). "[A] successful malicious prosecution plaintiff may recover, in addition to general damages, compensation for any arrest or imprisonment, including damages for discomfort or injury to his health, or loss of time and deprivation of the society." *Id.* (citation and quotation marks omitted).

Relevant to Anderson's malicious prosecution claim, Anderson testified that he was detained in Cook County Jail for two and a half to three days after he was processed. (Trial Tr. 95: 8-15.) Anderson testified that he was in significant pain the entire time of his pretrial detention because all he had received for treatment to his injured leg as an ice pack.  Later, after he was released, he learned that his leg was in fact broken. (Trial Tr. 164:18-22.) Anderson missed a day of work, where he made $13.80 per hour. (Trial Tr. 46). While at Cook County Jail, Anderson had to stand for three hours in significant pain in a holding cell. (Trial Tr. 95:12-15.) Anderson further testified that he was placed in a cell with bunk beds and he had to climb to the top bunk, the entire time while suffering from a broken led that had not yet been diagnosed. which was very difficult and caused his leg to be in severe pain.[3] (Trial Tr. 97.) Anderson also

---

[3] In one area of offensive cross examination, counsel for the Defendants challenged Anderson about his ability to climb to the top bunk and his failure to ask for an accommodation because of his injury. (Trial Tr. 166:5-25.) The defense further challenged the validity of Anderson's injury in spite of a doctor's determination that his leg was broken. (Trial Tr. 12-20.) This position, in itself, could have impacted the jury's award.

testified that it was cold and uncomfortable at the jail. (*Id.*) Anderson additionally stated that he went to court twice thereafter on his criminal charges, once on his domestic battery charge, and once on his unlawful possession of a firearm charge. (Trial Tr. 99-101.) Anderson paid a private attorney $1,250 to represent him at his gun charge proceeding. (Trial Tr. at 100-01.) Anderson further testified that now, three years removed from the proceedings, he is afraid of the police and will not talk to them or go to them with problems. (Trial Tr. 111:3-8.) Anderson testified he had no fear of the police before the incident.

Taking the above testimony into consideration, the jury reasonably could have found that the criminal charges levied against Anderson, coupled with the three days he had to spend in Cook County Jail while injured, seriously traumatized Anderson. The jury was instructed to consider future harm to Anderson, and Anderson testified that he is afraid of police officers to the day. Considering Anderson's testimony, the Court concludes that the $150,000 compensatory damage award for Anderson's malicious prosecution claim was not "monstrously excessive" and was rationally related to the evidence. *See Hendrickson*, 589 F.3d at 892-93. Nor is the award here significantly out of line with awards in similar cases. *See, e.g.*, *Adams v. City of Chicago*, No. 06 CV 4856, 2014 WL 2621115 (N.D. Ill. June 10, 2014) (remitting award to $125,000 where plaintiff spent just over 24 hours in jail); *Egan v. City of Chicago*, No. 10 CV 5518, 2012 WL 6963983 (N.D. Ill. Oct. 12, 2012) ($100,000 compensatory damages for false arrest and malicious prosecution claims where plaintiff was detained for approximately six hours); *Paradiso v. Obaldo*, No. 07 CV 4247, 2009 WL 5799690 (N.D. Ill. Nov. 24, 2009) ($100,000 compensatory damages for false arrest and $100,000 compensatory damages for malicious prosecution where plaintiff was transported to police station, detained, photographed, and charged with misdemeanor battery); *Moore v. City of Chicago*, No. 02 C 5130, 2008 WL

4542734 (N.D. Ill. July 25, 2008) (upholding $250,000 award for false arrest and detention of twelve hours where plaintiff was particularly susceptible to distress). Here, the Defendants have not shown that the jury's award for Anderson's malicious prosecution claim was "beyond the pale." *Thompson*, 625 F.3d at 409. Accordingly, the Court denies the Defendants' motion for remittitur with respect to the malicious prosecution claim.

## CONCLUSION

For the reasons stated herein, the Court denies the Defendants' motion for judgment as a matter of law on Anderson's malicious prosecution claim and affirms the jury's verdict, denies the Defendants' motion for a new trial, and denies the Defendants' motion for remittitur.


_____
Virg
United States District Court Judge
Northern District of Illinois

Date:  3/31/2015